UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MARCOS POVENTUD,                                    :

              Plaintiff,                           :          **AMENDED COMPLAINT**

         -against-                              :          Index No. 07 Civ. 3998 (DAB)(THK)

CITY OF NEW YORK; DANIEL TOOHEY,                    :
"FRANKIE" ROSADO, CHRISTOPHER DOLAN,
and KENNETH UMLAUFT, Individually and as            :
Members of the New York City Police Department,
                                           :

                Defendants.
-----------------------------------------------------------------X

      Plaintiff MARCOS POVENTUD ("Plaintiff"), by his attorneys, ROMANO & KUAN,

PLLC, and the LAW OFFICES OF JOEL B. RUDIN, complaining of the Defendants,

respectfully alleges, upon information and belief, as follows:

### NATURE OF ACTION

      1.      This is a civil action, pursuant to 42 U.S.C. §1983, 1985 and 1988, and *Brady v.*

*Maryland*, 373 U.S. 83 (1963) ("*Brady*"), seeking monetary damages for Plaintiff's wrongful

attempted murder and robbery conviction, and imprisonment for nearly *eight years*, during

which he was repeatedly sexually and physically assaulted, and traumatized.

      2.      Defendants – individual New York City police detectives and the City of New

York – violated, or caused the violation, of Plaintiff's constitutional rights both during the

investigation of the underlying crime – a robbery-shooting – and during Plaintiff's subsequent

trial. The detectives manufactured the false identification evidence that became the basis for the

prosecution and the only evidence of plaintiff's "guilt," and then withheld from Plaintiff and his

attorneys exculpatory evidence, known as "*Brady* material," that would have shown the

unreliability of the identification testimony they had manufactured. Their misconduct was substantially caused by the policies, customs, and practices of policymakers for the City of New York.

3. As explained in more detail below, detectives assigned to the investigation of the attempted murder and robbery of a livery cab driver in the Bronx knew that the victim, who was shot in the head and nearly died, was an unreliable identification witness. They knew he was unreliable because he had selected as the shooter a man who was in prison when the crime occurred and could not have committed it. Suspecting that Plaintiff, the man's brother, might have been involved, they then suggestively showed the witness three successive photo arrays containing Plaintiff's photograph, until, on the third try, he finally selected the Plaintiff. They then followed up that highly unreliable identification with a lineup, at which the victim's selection of the Plaintiff, following the highly suggestive photo identification procedures, was virtually a foregone conclusion. In bringing this case to the Bronx District Attorney's Office and causing that Office to initiate a prosecution, they then failed to disclose the initial false identification, causing the trial jury to convict Plaintiff because it did not know this crucial information, and causing Plaintiff to be sent away to State prison.

4. When the District Attorney's Office ultimately learned about the withheld *Brady* material, it had an obligation to disclose it and to remedy the injustice caused by its previous suppression. Instead, it first tried to cover it up. When this proved impossible, it then prolonged Plaintiff's incarceration by relying on the false claim of the chief detective that he had told the defense attorneys this information during the trial, even though it had been told, by the original prosecutor, that this claim was untrue. Indeed, it withheld the original prosecutor's statement (still another *Brady* violation), while arguing the "veracity" of the detective.

2

Ultimately, the original trial judge overturned Plaintiff's conviction, but not until Plaintiff had served eight horrible years in prison.

5.     Plaintiff seeks to recover monetary damages from the individual police detectives who manufactured the false case against him and covered up the exculpatory evidence, and against the City of New York, pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978), for the deliberate indifference of policymaking officials at the New York City Police Department ("NYPD") and the Bronx District Attorney's Office ("BDAO") to such types of constitutional violations, which was a substantial cause of the wrongdoing that occurred in this case.

## STATEMENT OF JURISDICTION

6.     At all times herein mentioned, Plaintiff was a resident of the County of Bronx, City and State of New York.

7.     Defendant CITY OF NEW YORK ("Defendant CITY") is a municipal corporation existing by virtue of the laws of the State of New York.

8.     The NYPD is an agency of the Defendant CITY, and all police officers and detectives referred to herein were at all times relevant to this complaint its employees and agents.

9.     Defendant DANIEL TOOHEY ("Defendant TOOHEY"), Tax I.D. No. 888030, was at all relevant times a detective employed by the NYPD.  He is named here in his official and individual capacities.

10.     Defendant "FRANKIE" ROSADO ("Defendant ROSADO"), Tax I.D. No. 892012, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

3

11.    Defendant CHRISTOPHER DOLAN ("Defendant DOLAN"), Tax I.D. No. 891468, was at all relevant times a detective employed by the New York City Police Department. He is named here in his official and individual capacities.

12.    Defendant KENNETH UMLAUFT ("Defendant UMLAUFT"), Tax I.D. No. 881484, was at all relevant times a detective employed by the New York City Police Department. He is named here in his official and individual capacities.

13.    At all times material to this Complaint, the aforementioned individual Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

14.    The District Attorney's Office of Bronx County is an agency of Bronx County, a constituent county of the City of New York, and of the State of New York.

15.    The District Attorney and Assistant District Attorneys of Bronx County are agents and employees of both Bronx County and of the City of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Investigation of the Shooting of Younis Duopo

16.    The victim in the underlying criminal case was a livery cab driver named Younis Duopo. During a robbery attempt, he was shot in the head at approximately 8:00 p.m. on March 6, 1997, by two passengers who were in the back seat of Duopo's cab. Duopo was hospitalized but survived.

17.    Duopo's livery cab was vouchered by trained NYPD Crime Scene Unit ("CSU") detectives.

18.    It was the job of these detectives to search the taxicab for and to secure all physical evidence possibly related to the crime.

4

19.     They found 16 fingerprints, but none were Plaintiff's. They found a hat and a spent shell, but this evidence also could not be linked to Plaintiff.

20.     After the CSU finished its work, Defendant ROSADO allegedly found a blue canvas wallet on the floor of the front passenger seat of Duopo's livery cab.

21.     This area had been searched and photographed by the CSU detectives, who did not find any such wallet.

22.     The wallet purportedly found by Defendant ROSADO contained two old photo identification cards of a man named Francisco Poventud, and nothing else.

23.     Considering Francisco Poventud a suspect, Defendant UMLAUFT, on the evening of March 10, 1997, showed Francisco Poventud's picture, taken from one of the identification cards, to Duopo.

24.     Duopo identified Francisco Poventud as one of his assailants.

25.     Duopo, in UMLAUFT's presence, signed and dated a photocopy of Francisco Poventud's identification card.

26.     Following this identification, Defendants TOOHEY, ROSADO, DOLAN and UMLAUFT (the "Individual Defendants") learned that Francisco had been incarcerated on the date of the shooting, and therefore could not have been one of the men involved.

27.     The Individual Defendants realized that Duopo's identification was erroneous and would undermine any subsequent identification that Duopo made.

28.     They failed to prepare any report that would reveal or draw attention to the erroneous identification.

29.     Once Francisco Poventud was eliminated as a suspect, the Individual Defendants, having nowhere else to turn to "solve" the case, decided to investigate Francisco Poventud's family members, including Plaintiff, who was Francisco's brother.

30.     Francisco and Marcos Poventud are not twins and, at the time of the crime, had little resemblance to one another.

31.     Nevertheless, on March 12, 1997, the Individual Defendants went to the hospital and showed Duopo a photo array that included Plaintiff's photograph, and five "fillers."

32.     Duopo did not make any identification.

33.     The next day, on March 13, 1997, the Individual Defendants returned to the hospital with the same photo array.

34.     Duopo looked at the photos in the array and did not make an identification.

35.     The following day, on March 14, 1997, the Individual Defendants again returned to the hospital, this time with a new photo array.  It again contained a photograph of Plaintiff, but five different fillers.

36.     Thus, Plaintiff was the only individual depicted in all three photo arrays.

37.     After being shown the third photo array containing Plaintiff's photograph, Duopo, for the first time, identified Plaintiff as one of the perpetrators.

38.     Following this identification, the Individual Defendants arrested Plaintiff.

39.     They also searched his residence, but found no evidence linking Plaintiff to the crime.

40.     The police theory apparently was that Plaintiff had somehow dropped his brother's wallet containing the identification cards onto the floor near the front passenger seat of

6

the victim's taxicab, despite committing the robbery from the back seat and having no reason to display the wallet at all.

41.    Police found no fingerprints or DNA evidence on the wallet or the cards to link Plaintiff to these items.

42.    Indeed, Defendant ROSADO testified that, despite his experience and training, he so carelessly handled these items that no fingerprints could be obtained.  The police also had no evidence that the wallet had been dropped during the robbery, as opposed to appearing in the taxicab at some other time.

43.    Following his arrest, Plaintiff voluntarily waived his *Miranda* rights and made a videotaped statement to police.

44.    He said, in substance, that he had been playing video games at a neighbor's apartment at the time of the crime, and provided the names of alibi witnesses.

45.    Upon information and belief, the Individual Defendants did not bother to investigate this alibi, but simply proceeded with processing Plaintiff's arrest.

46.    On or about March 23, 1997, 17 days after the Duopo shooting, police apprehended three men for a gunpoint robbery of a livery cab driver committed in a similar manner as the Duopo robbery in the same general vicinity in the Bronx.

47.    Ballistics tests with the gun used in that robbery conclusively established that it was the same weapon that had been used to shoot Duopo.

48.    Jesus Martinez, the gunman in the second robbery, when compared with the appearance of the other two men arrested with him, most closely resembled the description of the shooter provided by Duopo.

49.    Rather than take the risk that Duopo would identify Martinez and undercut their case against Plaintiff, police did not exhibit Martinez to Duopo either in a photo array or lineup.

50.    Instead, on April 2, 1997, police showed Duopo, who knew that an arrest had been made following his photo identification of Plaintiff, a lineup containing Plaintiff. Unsurprisingly, Duopo identified Plaintiff.

51.    The Individual Defendants knew that Duopo's mis-identification of Francisco Poventud was highly relevant to the District Attorney's evaluation of the strength of the evidence against Plaintiff, to the grand jury's decision whether to indict, to the court's decision whether to grant reasonable bail, to the court's decision whether to permit Duopo to make an in-court identification, and to the ultimate decision of the jury at trial whether or not to convict Plaintiff.

52.    Nevertheless, the Individual Defendants did not inform the District Attorney's Office of the Francisco Poventud mis-identification.

53.    After Plaintiff's arrest, Duopo identified Robert Maldonado as the second perpetrator.    Again, the Individual Defendants employed highly suggestive identification procedures, both during a photo array and during a lineup.    Maldonado was arrested and charged in the same indictment as Plaintiff.

54.    The BDAO did not inform the grand jury, which indicted Plaintiff, that Duopo had mis-identified Francisco Poventud, nor did it inform the court, which set prohibitively high bail of $100,000, causing Plaintiff to be incarcerated until trial.    One of the factors that the court considered in setting bail was the strength of the prosecution's case.

**The Trial Proceedings**

55.      Following Plaintiff's indictment, Plaintiff's counsel made a specific request of the prosecution to disclose whether any witness had "identified anyone other than defendant or codefendant as perpetrators of the crimes charged," and to disclose "all evidence and information . . . which may tend to exculpate defendant either by an indication of his innocence, or by potential impeachment of a witness to be called by the District Attorney within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963) and *People v. Rosario*, 9 N.Y.2d 286 (1961)."

56.      Under the *Brady* disclosure rule, the prosecution has a continuing obligation to disclose material information favoring the criminal defendant in the possession, custody or control of the District Attorney's Office or the NYPD, especially where the defendant specifically demands such disclosure.  In a specific-demand case, the prosecutor's failure to disclose is likely to mislead the defense into assuming that such evidence does not exist, and thus the prosecution's disclosure obligation is heightened.

57.      In addition, under the related *Rosario* rule, the prosecution has an obligation to disclose to the defense all prior recorded statements of each of its trial witnesses, so that counsel for the accused may determine whether such statements may be used to cast doubt on the witness's testimony.

58.      Duopo's handwritten notation on Francisco Poventud's photograph mistakenly identifying him was a "statement" that had to be disclosed under *Rosario* as well as under *Brady*.

59.      The *Brady* and *Rosario* rules require the prosecution to review the files of the

District Attorney's Office and the police to make sure that all such evidence is disclosed. The obligation to disclose is absolute, without regard to whether the prosecutor and the police are consciously aware of the evidence or are acting in bad faith to violate a duty to disclose.

60.     At no time prior to or during the trial of Marcos Poventud did the District Attorney's Office disclose to the defense that Duopo had mis-identified Francisco Poventud.

61.     This was so even though a pretrial hearing was conducted by the court into whether the out-of-court identification procedures used with Duopo had satisfied constitutional requirements and whether Duopo's ability to make an in-court identification was sufficiently reliable that the court would permit him to do so at the trial.

62.     At the hearing, the court expressed concern that the repeated showing of Marcos Poventud's photograph to Duopo during the three photo identification procedures was unfairly suggestive and raised questions about his ability to make a reliable, in-court identification.

63.     The prosecution then presented Duopo as a witness to establish the "reliability" of his identification of Plaintiff, but did not reveal to the court or to the defense the Francisco Poventud mis-identification.

64.     As a result, the court, without knowing that Duopo had made a mistaken identification of Plaintiff's brother, ruled that his ability to make an in-court identification was sufficiently reliable to permit such a procedure.

65.     At trial, the only evidence presented by the prosecution to link Plaintiff to the robbery incident was the identification testimony of Duopo, together with ROSADO's testimony that he had discovered Plaintiff's brother's wallet in the vehicle.

66     When defense counsel noticed discrepancies in photocopies of the Francisco Poventud ID cards, ADA Gregg Turkin, the assistant district attorney assigned by the BDAO to

10

prosecute Plaintiff, assured counsel, and the court, that the photocopies had nothing to do with the trial.

67.     Turkin explained that, because Francisco Poventud had been incarcerated when the crime occurred, police had quickly eliminated him as a suspect.

68.     Defense counsel interviewed defendant UMLAUFT about the case outside of the courtroom, but, in reliance on Turkin's statements, did not ask him about the Francisco Poventud photographs, and UMLAUFT did not reveal the Francisco Poventud mis-identification.

69.     Plaintiff testified in his own behalf that at the time of the crime he was at a neighbor's apartment playing video games and watching movies.

70.     Several defense witnesses corroborated this alibi.

71.     In addition, the defense presented evidence that the weapon used to shoot Duopo had been recovered in the possession of three other men, during a similar robbery attempt, just 17 days after the Duopo robbery.

72.     Turkin argued on summation that Duopo's identification of Plaintiff was reliable and accurate, and proved Plaintiff's guilt beyond a reasonable doubt, without revealing Duopo's mistaken identification of Francisco Poventud.

73.     Despite believing that the police investigation had been "sloppy" and a "mess," Turkin had UMLAUFT testify that he had "no problem" with it and, during his summation, Turkin personally vouched for the professionalism of the police investigation.

74.     Even without knowledge of the exculpatory identification evidence, the jury initially said it was deadlocked.

11

75.     On the morning of the third day of deliberations, the jury requested a "read back" of the detectives' and the complainant's testimony regarding the "negative results" from the March 13, 1997, photo array involving Plaintiff's photo.

76.     That evening, the jurors stated they were "hopelessly deadlocked" with regard to both defendants.

77.     Nevertheless, after the court required them to continue deliberating for two more days, the jury returned a verdict of guilty against both defendants.

78.     On June 30, 1998, the court sentenced Plaintiff to serve an indeterminate sentence of 10 to 20 years in prison.

79.     At the time of Plaintiff's conviction, he was 26 years old, had never been in prison before, and was of slight build.

80.     These characteristics of Plaintiff were known to the Individual Defendants.

81.     It was also widely known that individuals with Plaintiff's characteristics were likely to be physically and sexually assaulted in New York City jails and in New York State maximum security prisons.

82.     While Plaintiff appealed his conviction, the BDAO still did not disclose Duopo's mis-identification of Francisco Poventud.

83.     Plaintiff's appeal was denied. *See People v. Poventud*, 300 A.D.2d 223, 752 N.Y.S.2d 654 (1st Dep't 2002), *leave to appeal denied*, 1 N.Y.3d 578, 775 N.Y.S.2d 794 (2003).

**The Discovery of the Exculpatory Evidence and Vacatur of Plaintiff's Conviction**

84.     On April 25, 2002, the New York Court of Appeals reversed co-defendant Robert Maldonado's conviction, and directed a re-trial. *See People v. Maldonado*, 97 N.Y.2d 522, 743 N.Y.S.2d 389 (2002).

12

85.    At the retrial held in late 2003, Duopo's ability to make a reliable identification was again the principal issue.

86.    By the time of this re-trial, either the NYPD or the BDAO had somehow lost or destroyed the original Francisco Poventud identification cards.

87.    A new prosecutor was assigned to the case, Assistant D.A. Jeremy Shockett.

88.    He offered as a substitute for the original cards a photocopy of one of them.

89.    The photocopy contained an illegible signature, and a date and time – "3/10/97 at 1943 hrs."

90.    Shockett made an application to the court for permission to redact such handwritten material from the photocopy of the identification card, but the defense objected and the court denied the request.

91.    Maldonado's attorney demanded to know the significance of the handwriting.

92.    Shockett then revealed what he had not before – that the handwriting was Duopo's and concerned his mistaken identification of Francisco Poventud .

93.    To try to minimize the shock value of this new evidence, Shockett himself called UMLAUFT to testify and to reveal the mis-identification to the jury.

94.    UMLAUFT tried to minimize the impact of this evidence by claiming that Duopo, from his hospital bed, handwrote a note stating that the photograph merely "looked like the guy."

95.    UMLAUFT knew such note, as a recorded statement by Duopo, had to be disclosed to the defense as *Rosario* material.

96.    He testified that he had placed the note in the police file.

97.    However, he was unable to produce it – he claimed it was "lost."

13

98.     This time, the jury acquitted Maldonado.

99.     On March 25, 2004, Plaintiff, who was indigent, requested, and the court thereafter agreed, to assign counsel for him to prepare and file a motion, pursuant to N.Y. Criminal Procedure Law § 440.10, to vacate his conviction on the ground that the prosecution had impermissibly failed to disclose to him *Brady* material -- the Francisco Poventud identification -- at his trial six years before.

100.    On December 6, 2004, Plaintiff's assigned counsel filed a CPL § 440.10 motion to vacate his conviction. The motion asserted that, at the time of Plaintiff's trial in 1998, Plaintiff and his attorney were not told, and did not know, that Duopo had misidentified Francisco Poventud.

101.    Before responding to this motion, ADA Shockett interviewed UMLAUFT and Turkin.

102.    UMLAUFT claimed that he had told Turkin, during Plaintiff's trial in 1998, about the Francisco Poventud identification procedure.

103.    UMLAUFT further claimed that, at Turkin's direction, he disclosed the identification, as well as the existence of Duopo's handwritten note stating that "it looks like him," to defense counsel when they interviewed him during the trial.

104.    However, Turkin directly contradicted UMLAUFT. Turkin told Shockett, in substance, that UMLAUFT did not tell him, and he did not know, at the time of Plaintiff's trial, that the police had shown Francisco Poventud's photograph to Duopo.

105.    Shockett submitted papers to the court, including UMLAUFT's affidavit, claiming that UMLAUFT had told Plaintiff's attorney at the original trial about the Francisco Poventud misidentification and Duopo's handwritten note.

14

106.    However, Shockett did not reveal Turkin's statement contradicting UMLAUFT and supporting the *defense*.

107.    Both UMLAUFT's statements denying the original *Brady* violation, and the District Attorney's suppression of Turkin's statements contradicting UMLAUFT, were additional violations of the *Brady* rule which resulted in delaying decision of the motion and prolonging Plaintiff's incarceration.

108.    At an evidentiary hearing held on June 15, 2005, the court (Hunter, J.S.C.) had to resolve a credibility issue involving the conflicting testimony of the two original defense lawyers, who denied that UMLAUFT told them about the Francisco Poventud misidentification, and UMLAUFT, who swore that he first told Turkin, then told the two defense counsel.

109.    Still, ADA Shockett did not disclose Turkin's statement favoring the defense on this critical issue.

110.    Even without knowing about Turkin's statement favoring the defense, the court ruled for the defense.

111.    In a decision dated October 6, 2005, it held that the prosecutor's failure to turn over information and written documents that Younis Duopo had identified Francisco Poventud had violated plaintiff's federal constitutional rights under *Brady*.

112.    The court vacated Plaintiff's conviction. *See People v. Poventud*, 10 Misc.3d 337, 802 N.Y.S.2d 605 (Sup. Ct. Bronx Co. 2005), annexed hereto as Exhibit A.

113.    Plaintiff had been incarcerated for nearly eight years since his arrest, including seven years since his conviction.

## Plaintiff's Injuries and Damages

114.    As a direct, proximate, and reasonably foreseeable consequence of the aforementioned actions by the defendants, plaintiff:

(1)    Was denied his state and federal constitutional rights and liberties;

(2)    Was repeatedly subjected to sexual assaults at knife point, including anal and oral sodomy, and physical beatings;

(3)    Was further traumatized by witnessing sexual and physical assaults on other inmates;

(4)    Was so distraught that he tried to kill himself;

(5)    Suffered severe mental, emotional, and physical distress;

(6)    Suffered permanent mental, emotional, and physical injuries and impairments;

(7)    Was denied the opportunity to pursue normal relationships with and to enjoy the companionship of family members and friends;

(8)    Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation;

(9)    Suffered lost wages and permanent impairment of earning capacity; and

(10)    Incurred other items of attendant damages.

## FIRST CAUSE OF ACTION

### (42 U.S.C. §1983; Denial Of Due Process And A Fair Trial; All Individual Police Defendants)

115.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 as if fully set forth herein.

16

116.    The Individual Police Defendants manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspired to manufacture, identification "evidence", including Duopo's out-of-court and in-court identifications of Plaintiff, which they knew or should have known was false, or highly likely to be false, because it resulted from their use with a vulnerable and unreliable crime victim of highly and unnecessarily suggestive identification procedures likely to produce an irreparable misidentification.

117.    The defendants intended and caused such "evidence" to be used against Plaintiff in criminal proceedings, thereby causing his wrongful arrest, indictment, and conviction, loss of liberty, and other injuries.

118.    Furthermore, prior to Plaintiff's conviction in 1998, and continuing thereafter, the Individual Police Defendants, acting individually and in concert and conspiracy with one another, withheld knowledge from the BDAO, Plaintiff, and his counsel that Younis Duopo had falsely identified Francisco Poventud as one of the perpetrators of the robbery, and withheld documents containing Duopo's statements falsely identifying Francisco Poventud as one of the perpetrators.

119.    The Individual Police Defendants suppressed the Duopo false identification evidence with the knowledge, or with deliberate indifference to their knowledge, that such suppression would detrimentally affect, burden, or violate Plaintiff's federal constitutional rights, including his right to reasonable bail under the Eighth and Fourteenth Amendments and his rights under the Fifth, Sixth, and Fourteenth Amendments to due process and to a fair trial.

120.    Defendant UMLAUFT thereafter perpetuated the defendants' individual and collective wrongdoing, and caused the wrongful continuation of Plaintiff's imprisonment, by falsely telling the BDAO at the time of Maldonado's re-trial, and thereafter, that he had

17

disclosed the Francisco Poventud identification to the defense at Plaintiff's trial, and by making false statements to the BDAO, submitting a false affidavit, and giving false testimony in opposition to Plaintiff's CPL 440 motion.

      121.   The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

(a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including out-of-court and in-court identification statements and testimony, or the statements and testimony of witnesses who have been improperly influenced or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and

(c)    To be free of excessive bail, pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

      122.   The foregoing violations of Plaintiff's federal constitutional rights by the Individual Police Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused Plaintiff's imprisonment on excessive bail, his wrongful conviction, his imprisonment, and his other injuries and damages.

      123.   The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Individual Police Defendants' employment and authority.

      124.   Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

125.    By reason of the foregoing, all the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## SECOND CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983:  Claim Against Defendant City of New York For The Actions Of The NYPD)

126.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 125 as if fully set forth herein.

127.    The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

128.    Prior to Plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected of criminal activity and to the risk of arresting, prosecuting and convicting innocent people, elected not to provide police officers and detectives with minimally adequate training (or any training at all), and elected not to adopt minimally adequate policies, procedures, or standards, concerning the police use of photographic arrays and investigative lineups with eyewitnesses to crime in order to reliably identify criminal perpetrators and to obtain reliable identification evidence and testimony.

129.    In addition, NYPD policymaking officials instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all

19

material evidence or information (*"Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying witness is unreliable, and evidence impeaching the credibility of prosecution witnesses, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

130.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)    that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

131.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

a)    judicial decisions criticizing the conduct of NYPD officers in conducting improperly suggestive identification procedures (*see* Ex. B, appended hereto and incorporated herein by reference, listing some of those judicial decisions);

b)    numerous credible allegations, many substantiated by judicial decisions, that police officers had wrongfully withheld, lost, or destroyed evidence favoring the defense that they had been required to timely disclose to the prosecution or the

defense under *Brady* and *Rosario* (*see* Ex.C, appended hereto and incorporated herein by reference, listing some of those judicial decisions), including information bearing upon the reliability of eyewitness identifications and testimony;

c)    numerous civil lawsuits, some of which resulted in substantial civil settlements, alleging that police had falsified, exaggerated, or withheld evidence, thereby improperly causing unlawful injuries to individuals suspected of crime (*see* Ex. D, appended hereto and incorporated herein by reference, listing some of those lawsuits);

d)    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule;

e)    judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their *Brady* obligations, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*; and

f)    the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, and fail to disclose evidence favoring a criminal suspect or defendant.

132.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements with respect to the use of identification procedures and the disclosure of *Brady* material to prosecutorial authorities or defendants.

133.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by employees of the NYPD with the above-mentioned constitutional requirements.

134.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, and training sufficient to deter and to avoid conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

135.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

136.    By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

### THIRD CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983 Claim Against Defendant City Of New York For Actions Of The Bronx District Attorney's Office)

137.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 as if fully set forth herein.

22

138.    During his 440 hearing testimony, Defendant UMLAUFT testified that, during

Plaintiff's trial, he informed the prosecutor, ADA Gregg Turkin, about Duopo's erroneous

identification of Francisco Poventud from a photo array.  Assuming this testimony was true,

Turkin had the obligation under *Brady* to disclose this information to the defense, or to cause it

to be disclosed, but did not do so.

139.    On the other hand, if UMLAUFT did not disclose Duopo's erroneous

identification of Francisco Poventud to Turkin,  the latter had the obligation to review police

records and to interview police witnesses in order to obtain, for disclosure to the defense, all

*Brady* material.  Instead of trying in good faith to obtain and to disclose all *Brady* material in the

possession of the police, Turkin, by his own admission, deliberately and consciously avoided

obtaining such knowledge.

140.    Believing by his own admission that the police investigation was "sloppy" and a

"mess," he deliberately avoided learning from the police the specific mistakes they had made

during their investigation.

141.    He then knowingly presented false or misleading testimony by UMLAUFT,

and made knowingly false arguments during his closing statement, vouching for the good faith

and professionalism of the police investigation leading to the identification and arrest of

Plaintiff.

142.    Furthermore, he argued to the jury that Duopo's identification testimony at trial

was reliable even though he knew, or should have known, based upon Duopo's false

identification of Francisco Poventud, that this was not so.

143.    Turkin's conduct violated his and the prosecution's duty, pursuant to the Due

Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to make timely and complete disclosure under *Brady* of evidence and information favoring the criminal defendant, as well as to refrain from introducing evidence or making arguments that are false or misleading to the court or to the jury.

144.    Instead of disclosing information and evidence as required by law, ADA Turkin misled the court and the jury by introducing testimony, and arguing, with knowledge that such arguments were false, or with deliberate or reckless indifference to whether they were true or false, that Duopo's identification testimony was a highly reliable basis to convict Plaintiff, and that the police investigation had been conducted competently and professionally.

145.    Turkin's aforementioned acts of withholding *Brady* material and misleading the court and the trial jury were, individually and collectively, a substantial cause of Plaintiff's loss of liberty due to the court's denial of reasonable bail, Plaintiff's conviction at trial, Plaintiff's subsequent imprisonment, and Plaintiff's related or consequential injuries.

146.    Although the obligation to disclose *Brady* material and to correct false or misleading evidence, testimony, or argument is a continuing one, prosecutors, following Plaintiff's conviction and during his direct appeal, continued to withhold their knowledge of the aforementioned acts of misconduct.

147.    After plaintiff moved to vacate his conviction, prosecutors, including but not limited to ADA Shockett, further violated the Office's obligations to disclose *Brady* material, to refrain from presenting false or misleading evidence or argument, and to correct such evidence or argument, by (a) knowingly relying on the false affidavit and testimony of defendant Umlauft, and arguing the truthfulness of such affidavit and testimony, in opposition to plaintiff's motion,

24

and (b) withholding Turkin's statements contradicting Umlauft and supporting the Plaintiff's

position that Plaintiff's conviction had been unlawfully obtained.

148.    Indeed, rather than fully disclose and concede the *Brady* violations that they knew

had occurred and consent to plaintiff's motion seeking to overturn his conviction, the BDAO

ratified the Office's previous misconduct by falsely denying that any violation had occurred,

thereby substantially delaying the court's decision to vacate Petitioner's unlawful conviction,

prolonging Plaintiff's imprisonment and exacerbating his other injuries.

149.    The foregoing violations of Plaintiff's federal constitutional rights by ADAs

Turkin, Shockett, and others, and Plaintiff's resultant injuries, were directly, proximately and

substantially caused by conduct, chargeable to Defendant City, amounting to deliberate

indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by

the BDAO Office, namely:

(a)    the institution and implementation of plainly inadequate or unlawful policies,
procedures, regulations, practices and/or customs concerning:

i.    the duty not to use false, misleading or unreliable evidence, testimony,
statements or argument during criminal proceedings, including bail
hearings, pretrial hearings, and trial;

ii.    the continuing obligation to correct false, inaccurate, incomplete or
misleading evidence, testimony, statements and argument, whenever such
misconduct is discovered to have occurred, including moving or
consenting to overturn convictions discovered to have been obtained
through such unconstitutional means; and

iii.    the continuing duty to obtain from the police, to preserve, and to make
timely disclosure to the appropriate parties, including the court and the
defense, during criminal investigations and prosecutions, of all material
evidence or information favorable to a person suspected, accused or
convicted of criminal conduct, including exculpatory evidence as well as
evidence impeaching the credibility or undercutting the reliability of
prosecution witnesses;

(b)      the failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

150.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, the District Attorney of Bronx County and his delegates, who knew:

a)      to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)      that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

c)      that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

151.    The aforementioned policymaking officials had the knowledge alleged in ¶¶ 149-150 based upon, among other circumstances:

a)      numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady* and/or had presented or failed to correct false or misleading testimony and argument (*see* Exs. C and E, appended hereto and incorporated herein by reference, listing some of those judicial decisions);

b)      civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime (*see, e.g.,* Ex. D, appended hereto and incorporated herein by reference, listing some of those lawsuits);

26

    c)      numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Bronx prosecutors to comply with that rule;

    d)      judicial decisions putting the NYPD on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* obligations, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001); and

    e)      the inherent obviousness of the need to train, supervise and discipline ADAs in such obligations to counteract the inherent pressure on prosecutors to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, and fail to disclose evidence favoring a criminal defendant.

152.    Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

153.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant CITY were collectively and individually a substantial factor in bringing about the

aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

154.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Bronx County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations to disclose exculpatory evidence or *Brady* material to the defense and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument.

155.    The Bronx District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

156.    The District Attorney of Bronx County at all relevant times was and is an elected officer of Bronx County, one of the constituent counties of Defendant CITY, and the BDAO was and is funded out of the CITY's budget.

157.    Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the CITY's constituent counties (including Bronx County), and hence Defendant CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

158.    The District Attorney of Bronx County, Robert T. Johnson, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

159.    During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

160.    By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

### FOURTH CAUSE OF ACTION

**(Defendant City of New York for Negligent Hiring,
Training And Supervision; Pendent Claim)**

161.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 136 of this Complaint, and hereby incorporates them as though fully set forth herein.

162.    Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York on March 27, 2006.

163.    Hearings pursuant to New York General Municipal Law § 50-h were waived by Defendant City of New York.

164.    By virtue of the foregoing, Defendant City of New York is liable to Plaintiff for his injuries because of its careless, negligent, reckless and/or deliberate failure to properly hire,

train, discipline and supervise its agents, servants and/or employees employed by the NYPD

with regard to their aforementioned duties.

## JURY TRIAL DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.   For compensatory damages in an amount to be determined;

b.   For punitive damages against the individual Defendants in an amount to be
     determined;

c.   For reasonable attorneys' fees, together with costs and disbursements, pursuant to
     42 U.S.C. §1988 and to the inherent powers of this Court;

d.   For pre-judgment interest as allowed by law; and

e.   For such other and further relief as this Court may deem just and proper.

Dated:      New York, New York
            October 27, 2010

                              ROMANO & KUAN, PLLC


                              BY: Julia P. Kuan, Esq (JK 3822)
                              100 Lafayette Street, Suite 401
                              New York, New York, 10013
                              (212) 274-0777

                              LAW OFFICES OF JOEL B. RUDIN


                              BY: Joel B. Rudin, Esq. (JR 5645)
                              200 West 57th Street, Suite 900
                              New York, New York 10019
                              (212) 752-7600

                              *ATTORNEYS FOR THE PLAINTIFF*

To:   Corporation Counsel of the
      City of New York


30

802 N.Y.S.2d 605

Supreme Court, Bronx County, New York.

The PEOPLE of the State of New York

v.

Marcos POVENTUD, Defendant.

Oct. 6, 2005.

**Synopsis**

Background: Defendant moved to vacate his judgment of conviction for attempted murder in the second degree and other related crimes.

Holdings: The Supreme Court, Bronx County, Alexander W. Hunter, J., held that:

1 *Brady/Rosario* violation occurred when prosecutor failed to turn over written statement by complainant wherein he identified defendant's brother in photo array, and

2 *Brady/Rosario* violation warranted new trial.

Motion granted.

**Attorneys and Law Firms**

**605** Jeremy Shockett, Assistant District Attorney, Attorney for Plaintiff.

**606** Julia Kuan, Esq., Attorney for Defendant.

**Opinion**

ALEXANDER W. HUNTER, J.

**338** Defendant moved to vacate his judgment of conviction for attempted murder in the second degree and other related crimes on the ground that his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961) were violated and on the ground that there is newly discovered evidence.

This court decided the motion with respect to newly discovered evidence in a decision dated March 28, 2005. With respect to that branch of the motion that involved a *Brady/Rosario* violation, this court held a hearing that was conducted over several days beginning on May 12, 2005 and concluding on June 15, 2005. The parties were permitted to submit post-hearing briefs and the defendant's reply brief was received by this court on September 16, 2005. In determining that branch of the motion which involved the *Brady/Rosario* violation, this court hereby incorporates all of the documents submitted by the defendant and the People prior to the hearing of this matter in addition to the evidence introduced at the hearing. At the hearing, the defendant called two witnesses: Edmund Byrnes, Esq., trial counsel for defendant Poventud and Douglas Lyons, Esq., trial counsel for co-defendant Robert Maldonado. The People called one witness, Sergeant Kenneth Umlauft.

The defendant and a co-defendant, Robert Maldonado, were convicted on April 29, 1998 of shooting Younis Duopo during a robbery of his livery cab. In May 2002, the Court of Appeals reversed the conviction of Robert Maldonado and remanded the case for a new trial. During the course of Maldonado's second trial, defendant Poventud claims that new evidence was introduced which demonstrated that the prosecution did not turn over evidence that was favorable to the defendant, thus resulting in a *Brady* violation. Specifically, on March 10, 1997, the complainant viewed a photo array presented by Sergeant Kenneth

Umlauft, selected an identification card bearing the photograph of Francisco Poventud, the defendant's brother, initialed and dated it and wrote on a separate piece of paper "looks a lot like him."[1]

> 1    There are several variations of the exact statement made by the complainant.

At the heart of defendant's motion is his assertion that he was not informed by the prosecution that the complainant had selected Francisco Poventud, the defendant's brother, as a person resembling one of his assailants, nor did the prosecution provide the defense with any documentation written by the **\*339** complainant regarding said identification procedure, thus resulting in a *Rosario* violation. The piece of paper where the complainant wrote " looks a lot like him," was never turned over and has never been located though Sgt. Umlauft testified that it was placed in the case folder.

This court credits the testimony of defense counsel Edmund Byrnes and defense counsel Douglas Lyons. Defendant's trial counsel, Edmund Byrnes, testified at the hearing that he was never informed by the District Attorney's office of the identification proceeding involving defendant Poventud's brother Francisco nor was the paper where he wrote "looks a lot like him" ever turned over to him. He testified at length as to how he would have used that identification procedure at the trial if he had been informed of it. The People allege that during the trial, Sgt. Umlauft had an off- **\*\*607** the-record conversation with both Mr. Byrnes and co-counsel Douglas Lyons, wherein Sgt. Umlauft informed both attorneys as to this identification procedure involving defendant Poventud's brother. Douglas Lyons, Esq., testified that he did not recall having an off-the-record conversation with Sgt. Umlauft which involved the identification procedure at issue. Both attorneys testified that there would be no strategic or tactical reason not to use that misidentification procedure at the trial when identification of the defendants played such a major role.

Sgt. Umlauft's testimony was that he conducted the identification procedure at the hospital while the complainant was "awake" and "alert" but not able to speak. In addition, Sgt. Umlauft testified that the complainant did not have his glasses on but he looked at the photo array and wrote on a pad, "looks like him." Sgt. Umlauft had the complainant sign by the photo where he wrote that statement and testified that he had a conversation with the assigned Assistant District Attorney, Greg Turkin, about the identification proceeding. He further testified that A.D.A. Turkin told him to speak to the two defense attorneys at a recess during the trial about the identification proceeding and he did so in the rear of the courtroom.

 1    Under *People v. Vilardi*, 76 N.Y.2d 67, 556 N.Y.S.2d 518, 555 N.E.2d 915 (1990), the standard to be used to determine whether or not a defendant is entitled to a new trial based upon the prosecution's failure to disclose exculpatory material, which has been requested, is a "reasonable possibility" that the failure to disclose the exculpatory evidence contributed to the verdict. Moreover, C.P.L. § 240.45(1)(a), states that, **\*340** "After the jury has been sworn and before the prosecutor's opening address ... the prosecutor shall, subject to a protective order, make available to the defendant: (a) Any written or recorded statement ... made by a person whom the prosecutor intended to call as a witness at trial, and which relates to the subject matter of the witness's testimony." The prosecutor failed to turn over the written statement by the complainant wherein he identified defendant Poventud's brother, therefore, there was a violation under *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).

The numerous documents and transcripts submitted by the defendant in his motion demonstrate that the jury struggled with the issue of identification. In one of the jury's notes, a copy of which was attached to defendant's motion as Exhibit C, the jury requested to hear the testimony of the complainant regarding one of the photo arrays, they wanted to view the two photo arrays entered into evidence, they wanted to see defendant Poventud's identification cards from his wallet, and, more importantly, they wanted to hear testimony regarding "negative results." (See, Juror Note No. 3, Defendant's Exhibit C). Moreover, the jury sent a note to the court during deliberations, indicating that they were "hopelessly deadlocked." (See Juror Note # 6, Defendant's Exhibit 6).

In a case such as this one where the conviction depended on the identification by the complainant of the defendants, an identification of an individual other than the defendants on trial for the robbery is of great magnitude. The People, in their brief submitted August 26, 2005, assert that the misidentification and written statement made by the complainant is not *Brady* material and that there is no reasonable possibility that the material would have contributed to the verdict because the complainant was not

People v. Poventud, 10 Misc.3d 337 (2005)
802 N.Y.S.2d 605, 2005 N.Y. Slip Op. 25420

wearing his glasses at the time of the misidentification, was medicated, **608 and he was "not completely coherent." (People's Brief, p. 1-2).

2 Those factors listed by the People are for the jury to weigh and determine what significance, if any, to place upon them. The fact is that there was an identification procedure performed whereby the complainant identified an individual other than the defendants on trial as committing the robbery. The question of whether defendant Poventud and his brother facially look similar or not in appearance especially in light of the fact that *341 defendant's brother was incarcerated at the time of the robbery of Mr. Duopo is a crucial issue for the jury to consider. Whether or not material should be considered exculpatory and turned over to the defendant is not subject to question. This material was required by law to be turned over to the defense. What the defense and jury does with it is totally within their respective province of advancing a criminal defense and as fact finders.

Furthermore, whether or not the identification made by the complainant of the defendant's brother was a "tentative identification" as the People allege is not a factor in determining whether material is *Brady* material or not. Any identification procedure or misidentification procedure made by a complainant should be turned over to a defendant who stands accused of the crime regardless of the importance that the District Attorney's office may or may not place on it. The obligation to turn over such *Brady* material rests squarely on the shoulders of the prosecutor and in this instance, the prosecutor failed in his obligation.

Moreover, glaringly absent from the hearing was testimony from the assigned Assistant District Attorney, Greg Turkin, though he was available to testify as to his version of the events. The People assert that Assistant District Attorney Greg Turkin directed the defense attorneys to speak with Sgt. Umlauft regarding the photo array in question. However, as the defendant correctly asserts, the prosecutor had an affirmative duty to inform defense counsel about the identification procedure and defense counsel should not have to go on a "fishing expedition" to obtain said material.

This court finds that the defendant met his burden by a preponderance of the evidence that *Brady/Rosario* material was not disclosed and that there is a reasonable possibility that the material in question could have affected the outcome of the trial.

Accordingly, the defendant's conviction is hereby vacated and a new trial is hereby ordered which shall be preceded by a *Wade* hearing.

This shall constitute the decision and order of this Court.

**Parallel Citations**

10 Misc.3d 337, 2005 N.Y. Slip Op. 25420

**End of Document**                    © 2010 Thomson Reuters. No claim to original U.S. Government Works.

*Poventud v. City of New York*, 07 Civ. 3998 (DAB)(THK)

Exhibit B

1.  *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

2.  *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

3.  *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.  *People v. Johnson*, 81 N.Y.2d 828 (1993): Conviction reversed where court found improper the show-up identification of defendant by robbery victim conducted hours after the crime, where both the defendant and the complainant were transported to the crime scene.

5.  *People v. Rojas*, 213 A.D.2d 56 (1st Dept. 1994): Conviction reversed where identification procedure was improper and prejudicial.

6.  *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

7.  *People v. White*, 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book.

*Poventud v. City of New York*, 07 Civ. 3998 (DAB)(THK)

Exhibit C

1.  *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve. The court found that the D.A.'s office shared responsibility and the indictment was dismissed.

2.  *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

3.  *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.  *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

5.  *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6.  *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

7.  *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

8.  *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care."

9.  *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

10. *People v. Joseph*, 86 N.Y.2d 565 (1995): Adverse inference instruction appropriate where police deliberately destroyed interview notes.

11. *People v. White*, 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine

officer using missing memo book.

12.   *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997):  Conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained "variations".

13.   *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997): Conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that significantly were at variance with prosecution's evidence at trial and were favorable to defendant.

14.   *People v. Branch*, 175 Misc.2d 933 (Sup. Ct. Kings County 1998): People successfully fought motion to vacate judgment based upon confession of real killer; conviction overturned in 2002 after key prosecution witness recanted and said police paid him for his cooperation.

15.   *People v. Cannon*, 191 Misc.2d 136 (Sup. Ct. Kings Co. 2002): Motion to vacate conviction denied, but Brooklyn D.A.'s office and NYPD warned of future sanctions if the police continue policy of destroying or failing to preserve evidence.

*Poventud v. City of New York*, 07 Civ. 3998 (DAB)(THK)

Exhibit D

1.  *Hart v. City of New York,* 186 A.D.2d 398 (1st Dept. 1992): Damage award upheld against police officers who gave false grand jury and trial testimony.

2.  *Tong v. City of New York, et al.,* 95-cv-7965 [S.D.N.Y., settled 10/4/95, $35,000]: Plaintiff arrested for traffic violation, which was later dismissed. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

3.  *Dabbah v. City of New York, et al.,* 95-cv-2952 [S.D.N.Y., settled 3/12/96, $35,000]: Plaintiff arrested without probable cause on disorderly conduct charges; charges dismissed on People's motion 8 months after arrest.

4.  *Boland v. City of New York, et al.,* 93-cv-5058 [E.D.N.Y., settled 8/6/96, $30,000]: Plaintiff arrested without probable cause; held in custody for two nights.

5.  *Kadlub v. City of New York, et al.,* 95-cv-1080 [E.D.N.Y., settled 12/11/96, $34,000]: Plaintiff arrested without probable cause on drug possession and sale charges. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

6.  *Castro v. City of New York, et al.,* 94-cv-5114 [S.D.N.Y., settled 3/18/97, $72,500]: Plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

7.  *McCaskill v. City of New York, et al.,* 96-cv-3687 [E.D.N.Y., settled 7/10/97, $100,000]: Plaintiff arrested for disorderly conduct without probable cause; charges pending for approximately 6 months before dismissal by the court.

8.  *Gurley v. City of New York, et al.,* 95-cv-2422 [E.D.N.Y., settled 8/21/97, $1,7500,000]: Conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint alleged that NYPD had longstanding policy of deliberate indifference to the constitutional requirement that exculpatory evidence be preserved and disclosed to defendants.

9.  *Gaylock v. City of New York, et al.,* 96-cv-6183 [E.D.N.Y., settled 3/6/98, $90,000]: Plaintiffs arrested without probable cause on weapons charges, which were pending for

10 months before dismissal by court. Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

10. *Gordon v. City of New York, et al.*, 97-cv-8035 [S.D.N.Y., settled 11/12/98, $40,000]: Plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor 3 months after arrest.

11. *Perez v. City of New York, et al.*, 98-cv-2331 [S.D.NY., settled 1/16/99, $15,000]: Plaintiff arrested without probable cause; charges dismissed by court approximately 6 months after arrest.

12. *Ziehenni v. City of New York, et al.*, 98-cv-3763 [S.D.N.Y., settled 3/5/99, $55,000]: Plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

13. *Deluise v. City of New York, et al.*, 98-cv-2551 [S.D.N.Y., settled 3/18/99, $28,500]: Plaintiff arrested without probable cause.

14. *Napoli v. City of New York, et al.*, 97-cv-1255 [E.D.N.Y., settled 4/9/99, $60,000]: Plaintiff arrested on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

15. *Jefferson v. City of New York, et al.*, 98-cv-1097 [E.D.N.Y., settled 4/14/99, $175,000]: Plaintiff corrections officer arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

16. *Denizard v. City of New York, et al.*, 98-cv-423 [E.D.N.Y., settled 6/4/99, $64,000]: Plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

17. *Sweazie v. City of New York, et al.*, 99-cv-419 [E.D.N.Y., settled 10/20/99, $20,000]: Plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB.

18. *Daniels v. City of New York, et al.*, 00-cv-1981 [S.D.N.Y., settled 3/15/00, $28,500]: Plaintiff arrested without probable cause on weapons charges; charges dismissed by the court 8 months after arrest.

19. *Almonte v. City of New York, et al.*, 99-cv-519 [E.D.N.Y., settled 7/12/00, $30,000]: Plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court 1 year, 9 months after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional rights, failure to train police officers, and negligent hiring of officers, which caused plaintiff's malicious prosecution and unlawful arrest.

20. *Fields v. City of New York, et al.*, 99-cv-8130 [E.D.N.Y., settled 7/28/00, $15,000]: Plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court. Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

21. *Younger v. City of New York, et al.*, 00-cv-836 [S.D.N.Y., settled 9/1/00, $25,000]: Plaintiff arrested without probable cause; complaint alleged that arrest was made in retaliation for plaintiff's complaint to IAB.

22. *Lovell v. City of New York, et al.*, 00-cv-0002 [S.D.N.Y., settled 10/20/00, $40,000]: Plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB.

23. *Cotto v. City of New York, et al.*, 00-cv-1341 [E.D.N.Y., settled 12/01/00, $30,000]: Plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

24. *Coleman v. City of New York, et al.*, 00-cv-2019 [E.D.N.Y., settled 1/2/01, $60,000]: Two plaintiffs arrested without probable cause.

25. *Crespo v. City of New York, et al.*, 93-cv-8847 [S.D.N.Y., settled 8/29/06, $25,000]: Plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

*Poventud v. City of New York*, 07 Civ. 3998 (DAB)(THK)

Exhibit E

1. *People v. Castro,* 147 A.D.2d 410 (1st Dept. 1989): Hearing on § 440.10 motion ordered where co-defendant, unbeknownst to defendant at trial, provided information to prosecution.

2. *People v. Okafor*, N.Y.L.J. 9/8/89 at p. 21: *Rosario* and *Brady* violations found and conviction reversed where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case.

3. *People v. Olmo,* 153 A.D.2d 544 (1st Dept. 1989): New *Wade* hearing ordered where it was discovered that key witness gave perjured testimony and the prosecutor may have known about it.

4. *People v. Roman,* 150 A.D.2d 252 (1st Dept. 1989): Conviction reversed where prosecutor's improprieties on summation included, among other things, his attempt to give legal instruction to the jury, and his improper vouching for his own witnesses.

5. *People v. Negron,* 161 A.D.2d 537 (1st Dept. 1990): Conviction reversed where, among other things, prosecutor delivered a misleading summation accusing defendant and his counsel of fabricating theory of defense.

6. *People v. World,* 157 A.D.2d 567 (1st Dept. 1990): Conviction reversed where prosecutor denigrated defense theory of self defense, accused defendant of lying and tailoring his testimony to appear less culpable, suggested that defendant was not entitled to fair trial, and improperly vouched for credibility of eyewitness.

7. *People v. Jorge,* 171 A.D.2d 498 (1st Dept. 1991): Conviction reversed for improper summation based on prosecutor's inflammatory comments.

8. *People v. McReynolds,* 175 A.D.2d 31 (1st Dept. 1991): Conviction reversed based for prosecutor's improper impugning of defense counsel's integrity.

9. *People v. Butler,* 185 A.D.2d 141 (1st Dept. 1992): Conviction reversed where prosecutor's summation was found to violate the Code of Professional Responsibility.

10. *People v. Hernandez,* 185 A.D.2d 147 (1st Dept. 1992): Conviction affirmed, but prosecutor admonished regarding his summation and directed to receive training in order to refrain from future improper conduct.

11. *People v. Lewis,* 174 A.D.2d 294 (1st Dept. 1992): Conviction reversed where prosecutor failed to disclose deal made with different prosecutor in another city; misled the jury that no promises were made.

12.  *People v. Mudd*, 184 A.D.2d 388 (1st Dept. 1992): Conviction reversed for numerous reasons, including the prosecutor's summation which was "directly contrary to the evidence."

13.  *People v. Shears*, 184 A.D.2d 357 (1st Dept. 1992): Conviction affirmed where prosecutor improperly characterized defendant as a "magician," and improperly impugned defense witness's motives.

14.  *People v. Banfield*, 194 A.D.2d 330 (1st Dept. 1993), and *People v. Byfield*, 194 A.D.2d 331 (1st Dept. 1993): Convictions reversed where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants.

15.  *People v. Slaughter,* 189 A.D.2d 157 (1st Dept. 1993): Conviction reversed where, among other things, prosecutor improperly vouched for witnesses during summation.

16.  *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5 of eyewitness contradicting witness's trial testimony was withheld by prosecutor. The Court found that the People violated both *Brady* and *Rosario*.

17.  *People v. Ramos*, 201 A.D.2d 78 (1st Dept. 1994): Conviction reversed for prosecution's failure to turn over *Brady* material related to credibility of complaining witness in child abuse case.

18.  *People v. Rutter*, 202 A.D.2d 123 (1st Dept. 1994), and *People v. Bowen,* 234 A.D.2d 161 (1st Dept. 1996): Convictions reversed because, among other things, the prosecutor failed to disclose a transcript of a polygraph exam performed on the People's main witness containing both exculpatory and impeachment material.

19.  *People v. Johnson*, 212 A.D.2d 362 (1st Dept. 1995): Conviction affirmed, but court found summation "improper," as the prosecutor's comments were "misleading."

20.  *People v. Williams*, 212 A.D.2d 388 (1st Dept. 1995): Conviction reversed where prosecutor repeatedly ignored trial judge's rulings as to scope of questioning and argued on summation that defendant was guilty of other uncharged crimes.

21.  *People v. Lantigua*, 228 A.D.2d 213 (1st Dept. 1996): Conviction reversed where prosecutor failed to disclose that eyewitness was with another person when she allegedly saw the crime.

22.  *People v. Collins*, 173 Misc.2d 350 (Sup. Ct. Bronx Co. 1997): Conviction set aside for prosecutor's failure to disclose complainant's history of mental illness and substance

23.  *People v. King*, 241 A.D.2d 329 (1st Dept. 1997): Conviction reversed where prosecutor delayed turning over *Rosario* material.

24.  *People v. Mikel*, 710 N.Y.S.2d 70 (1ˢᵗ Dept. 1997): Conviction reversed where prosecutor failed to disclose that witness violated his cooperation agreement prior to trial by fleeing to Puerto Rico, and when he was returned, entered into a new cooperation agreement to cover the numerous felony charges stemming from his flight.

25.  *People v. Ortega*, 241 A.D.2d 369 (1ˢᵗ Dept. 1997):  Conviction reversed where, among other things, prosecutor failed to disclose the transcript of eyewitness's Grand Jury rebuttal testimony until its existence was discovered mid-trial.

26.  *People v. Olivero*, 272 A.D.2d 174 (1ˢᵗ Dept. 2000): Conviction reversed where, among other things, prosecutor "mischaracterized" evidence on summation.

27.  *Morales v. Portuondo*, 165 F. Supp.2d 601 (S.D.N.Y. 2001):  Convictions of two defendants unconditionally discharged based on prosecutor's failure to disclose key exculpatory evidence pointing to another perpetrator.

28.  *Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002): Suppression of favorable, material evidence, that third party in custody in another jurisdiction had confessed to hiring hit man to kill shooting victim, was a *Brady* violation that required relief.

29.  *Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2002): On the last day of trial prosecution disclosed that an additional memo book from one of the police witnesses had not been turned over and was lost.

30.  *People v. Johnson,* 191 Misc.2d 105 (Sup. Ct. Bronx Co. 2002): Conviction set aside for *Brady* and *Rosario* violations.

31.  *People v. Bruno*, Ind. No. 0027/97, N.Y.L.J., 4/23/03 at p. 19: Conviction reversed where prosecutor withheld information casting doubt on the voluntariness of a confession.

32.  *People v. LaPorte*, 306 A.D.2d 93 (1ˢᵗ Dept. 2003) Conviction reversed where prosecutor impugned defense counsel's integrity and ridiculed the defense.

33.  *People v. Spruill*, 5 A.D.3d 318 (1ˢᵗ Dept. 2004): Conviction reversed where prosecutor's summation comments improperly inflamed jury's emotions.

34.  *People v. Woods*, 9 A.D.2d 293 (1ˢᵗ Dept. 2004): Conviction reversed for *Crawford* errors at trial and also because prosecutor met with key witness alone in her office, and that witness could have viewed confidential records related to the trial.

35.  *People v. Aquilar,* 14 Misc.3d 1 (Sup. Ct. Bronx Co. 2006): Conviction reversed where prosecutor's comments on summation "exceeded the bounds of legitimate advocacy."

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MARCOS POVENTUD,                                  :

                              Plaintiff,          :      **AFFIDAVIT OF SERVICE**
                                                         **BY E-MAIL**
                       -against-                  :
                                                         Dkt. No. 07 Civ. 3998
CITY OF NEW YORK, DANIEL TOOHEY,                  :         (DAB)(THK)
"FRANKIE" ROSADO, CHRISTOPHER DOLAN,
and KENNETH UMLAUFT, Individually and as          :
Members of the New York City Police Department.

                              Defendants.         :

-----------------------------------------------------------------x

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF NEW YORK)

    THERESA PETERS, being duly sworn, deposes and says:

    I am employed by the Law Offices of Joel B. Rudin, 200 West 57th Street, Suite 900, New York, New York 10019, am not a party to this action and am over the age of 18 years.

    On October 28, 2010, I served by **E-mail** upon the following parties, each a true and correct copy of the annexed **Amended Complaint:**

Rachel Seligman Weiss, Esq.
Linda Donahue, Esq.
Peggy Migdalis, Esq.
Assistants Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007
*Attorneys for Defendants*

                                             THERESA PETERS

Sworn to before me this
28th day of October, 2010

Notary Public

TERRI S. ROSENBLATT
Notary Public, State of New York
No. 02RO6218380
Qualified in Kings County
Commission Expires Mar. 1, 20___