UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

MARCOS POVENTUD,                                    :

      Plaintiff,                              :     **<u>SECOND AMENDED COMPLAINT</u>**

      -against-                               :     Index No. 07 Civ. 3998 (DAB)(THK)

CITY OF NEW YORK; DANIEL TOOHEY,           :
"FRANKIE" ROSADO, CHRISTOPHER DOLAN,
and KENNETH UMLAUFT, Individually and as   :
Members of the New York City Police Department,
                                       :

              Defendants.                    :
----------------------------------------------------------------X

Plaintiff MARCOS POVENTUD ("Plaintiff"), by his attorneys, ROMANO & KUAN,

PLLC, and the LAW OFFICES OF JOEL B. RUDIN, complaining of the Defendants,

respectfully alleges, upon information and belief, as follows:

### <u>NATURE OF ACTION</u>

1.      This is a civil action, pursuant to 42 U.S.C. §1983 and *Brady v. Maryland*, 373

U.S. 83 (1963) ("*Brady*"), seeking monetary damages for Plaintiff's wrongful attempted murder

and robbery conviction, and imprisonment for approximately seven years, during which he was

repeatedly assaulted sexually and physically, and traumatized.

2.      The above-named Individual Defendants, all New York City police detectives,

caused Plaintiff's unconstitutional conviction and subsequent imprisonment by deliberately

suppressing exculpatory evidence, known as "*Brady* material," and also lying to and misleading

prosecutors.  The suppressed *Brady* material consisted of an erroneous identification by the

victim of the crime, who was the prosecution's sole identification witness, of a man who was in

*prison* when the crime was committed.  The deliberate police cover-up of such evidence, as well

as the lies police detectives told the prosecutors when denying that any undisclosed identification had occurred, was a substantial and proximate cause of Plaintiff's conviction and his horrible experiences in prison which followed. The City of New York is liable, pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978), for the deliberate indifference of policymaking officials at the New York City Police Department ("NYPD") to such constitutional violations, which was a substantial cause of the wrongdoing that occurred.

## STATEMENT OF JURISDICTION

3.      At all times herein mentioned, Plaintiff was a resident of the County of Bronx, City and State of New York.

4.      Defendant CITY OF NEW YORK ("Defendant CITY") is a municipal corporation existing by virtue of the laws of the State of New York.

5.      The NYPD is an agency of the Defendant CITY, and all police officers and detectives referred to herein were at all times relevant to this complaint its employees and agents.

6.      Defendant DANIEL TOOHEY ("Defendant TOOHEY"), Tax I.D. No. 888030, was at all relevant times a detective employed by the NYPD. He is named here in his official and individual capacities.

7.      Defendant "FRANKIE" ROSADO ("Defendant ROSADO"), Tax I.D. No. 892012, was at all relevant times a detective employed by the New York City Police Department. He is named here in his official and individual capacities.

2

8.      Defendant CHRISTOPHER DOLAN ("Defendant DOLAN"), Tax I.D. No. 891468, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

9.      Defendant KENNETH UMLAUFT ("Defendant UMLAUFT"), Tax I.D. No. 881484, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

10.     At all times material to this Complaint, the aforementioned individual Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Investigation of the Shooting of Younis Duopo

11.     The victim in the underlying criminal case was a livery cab driver named Younis Duopo.  During a robbery attempt, he was shot in the head at approximately 8 p.m. on March 6, 1997, by two passengers who were in the back seat of his cab.  Duopo was hospitalized but survived.

12.     Duopo's livery cab was vouchered by trained NYPD Crime Scene Unit ("CSU") detectives.

13.     It was the job of these detectives to search the taxicab for and to secure all physical evidence possibly related to the crime.

14.     They found 16 fingerprints, but none were Plaintiff's.  They found a hat and a spent shell, but this evidence also was not linked to Plaintiff.

15.     After the CSU finished its work, Defendant ROSADO claimed that he found a blue canvas wallet on the floor of the front passenger seat of Duopo's livery cab.

3

16.    This area had been searched and photographed by the CSU detectives, who did not find any such wallet.

17.    The wallet that Defendant ROSADO claimed to have found contained two old photo identification cards of a man named Francisco Poventud, and nothing else.

18.    Defendant UMLAUFT, a sergeant who was in charge of all the detectives working on the investigation, on the evening of March 10, 1997, showed Francisco Poventud's picture, taken from one of the identification cards, to Duopo.

19.    Duopo identified Francisco Poventud as one of his assailants.

20.    Duopo, in UMLAUFT's presence and at his request, signed a photocopy of Francisco Poventud's identification card.

21.    This was consistent with NYPD procedure, under which a witness is asked to sign his name next to a photograph to indicate a positive identification.

22.    Following this identification, Defendants TOOHEY, ROSADO, DOLAN and UMLAUFT (the "Individual Defendants") learned that Francisco Poventud was incarcerated on the date of the shooting, and therefore could not have been one of the men involved.

23.    The Individual Defendants, contrary to their training and to the official policy of the New York City Police Department, failed to prepare any report that would reveal or draw attention to the erroneous identification.

24.    Having nowhere else to turn to "close" the case, the Individual Detectives decided to investigate Francisco Poventud's family members, including Plaintiff, who is Francisco's brother.

25.    At the time of the crime, Plaintiff did not physically resemble his brother, nor did Plaintiff resemble Francisco as he was depicted in the old photograph identified by Duopo.

4

26.     Nevertheless, on March 12, 1997, the Individual Defendants went to the hospital and showed Duopo a photo array that included Plaintiff's photograph, and five "fillers."

27.     Duopo did not make any identification.

28.     The next day, on March 13, 1997, the Individual Defendants returned to the hospital with the same photo array.

29.     Duopo looked at the photos in the array and again did not make an identification.

30.     The Individual Defendants indicated in a report that this was a "negative result."

31.     The following day, on March 14, 1997, the Individual Defendants again returned to the hospital, this time with a new photo array. It again contained a photograph of Plaintiff, but five different fillers.

32.     Thus, Plaintiff was the only individual depicted in more than one photo identification procedure – in fact, his photo was in all three.

33.     After the third photo array procedure, Duopo, for the first time, identified Plaintiff as one of the perpetrators.

34.     Following this identification, the Individual Defendants, under the direction of UMLAUFT, caused criminal charges to be filed against Plaintiff for the robbery and shooting of Duopo.

35.     They also searched Plaintiff's residence, but found no evidence linking him to the crime.

36.     The police theory apparently was that Plaintiff had somehow dropped the wallet containing his brother's identification cards onto the floor near the front passenger seat of the victim's taxicab, even though the robbery was committed from the back seat and the perpetrators

5

had no reason to display the wallet at all, and despite the absence of any evidence that Plaintiff would carry his brother's wallet or identification cards.

37.    Police found no fingerprints or DNA evidence on the wallet or the cards to link Plaintiff to these items.

38.    The police also had no evidence that the wallet had been dropped during the robbery, as opposed to at some other time.

39.    Following his arrest, Plaintiff voluntarily waived his *Miranda* rights and made a videotaped statement to police.

40.    He said, in substance, that he had been playing video games at a neighbor's apartment at the time of the crime, and provided the names of alibi witnesses.

41.    Upon information and belief, the Individual Defendants did not investigate this alibi, but simply proceeded with processing Plaintiff's arrest.

42.    On or about March 23, 1997, 17 days after the Duopo shooting, police apprehended three men for a gunpoint robbery of a livery cab driver committed in a similar manner as the Duopo robbery in the same general vicinity in the Bronx.

43.    Ballistics tests with the gun used in that robbery conclusively established that it was the same weapon that had been used to shoot Duopo.

44.    Jesus Martinez, the gunman in the second robbery, when compared with the appearance of the other two men arrested with him, most closely resembled the description of the shooter provided by Duopo.

45.    Rather than take the risk that Duopo would identify Martinez and undercut their case against Plaintiff, police did not show Martinez to Duopo in a photo array or a lineup.

46.     Instead, on April 2, 1997, police showed Duopo, who knew that an arrest had been made after his photo identification of Plaintiff, a lineup containing Plaintiff. Unsurprisingly, Duopo identified Plaintiff.

47.     The Individual Defendants knew that Duopo's misidentification of Francisco Poventud was highly relevant to the Bronx District Attorney's evaluation of the strength of the evidence against Plaintiff, to the grand jury's decision whether to indict, to the court's decision whether to grant reasonable bail, to the court's decision whether to permit Duopo to make an in-court identification, and to the ultimate decision of the jury at trial whether to convict Plaintiff.

48.     The Individual Defendants knew that they were required by the policies, practices, and procedures of the NYPD, and of the Bronx District Attorney's Office ["BDAO"], to disclose all out-of-court identification procedures to prosecutors handling the criminal prosecution, so that such procedures could be timely disclosed to the defense.

49.     They were required to make such disclosure to the D.A.'s Office at the time of the initiation of the prosecution, at the time of the presentation of evidence to the grand jury, and/or prior to trial.

50.     Nevertheless, the Individual Defendants did not inform the BDAO of the Francisco Poventud misidentification, before, during, or after Plaintiff's trial. Indeed, when asked by the BDAO to disclose all out-of-court identification procedures utilized during their investigation of this matter, the Individual Defendants essentially lied by disclosing all but the Francisco Poventud identification procedures.

51.     Weeks after Plaintiff's arrest, again utilizing highly suggestive photo and in-person identification procedures, police caused Duopo to identify Robert Maldonado, who had no relationship with Plaintiff, as the second perpetrator. Maldonado was arrested.

52.     As a result of the police cover-up of the Francisco Poventud misidentification, the grand jury was deprived of essential information with which to evaluate Duopo's reliability as an identification witness, and Plaintiff and Maldonado were indicted.

53.     As a further result of the police cover-up of the Francisco Poventud misidentification, the court was misled concerning the strength of the case against Plaintiff and set prohibitively high bail of $100,000, causing Plaintiff to be incarcerated until trial.

**The Trial Proceedings**

54.     Following Plaintiff's indictment, Plaintiff's counsel made a specific request of the prosecution to disclose whether any witness had "identified anyone other than defendant or codefendant as perpetrators of the crimes charged," and to disclose "all evidence and information . . . which may tend to exculpate defendant either by an indication of his innocence, or by potential impeachment of a witness to be called by the District Attorney within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963) and *People v. Rosario*, 9 N.Y.2d 286 (1961)."

55.     Under the *Brady* disclosure rule, the prosecution has a continuing obligation to disclose material information favoring the criminal defendant in the possession, custody or control of the District Attorney's Office or the police, especially where the defendant specifically demands such disclosure.

56.     In a specific-demand case, the prosecutor's failure to disclose is likely to mislead the defense into assuming that such evidence does not exist, and thus the prosecution's disclosure obligation is heightened.

57.     In addition, under the related *Rosario* rule, the prosecution has an obligation to

disclose to the defense all prior recorded statements of each of its trial witnesses, so that counsel for the accused may determine whether such statements may be used to cast doubt on the witness's testimony.

58.    Duopo's handwritten notation on a copy of Francisco Poventud's photograph mistakenly identifying him was a "statement" that had to be disclosed under *Rosario* as well as under *Brady*.

59.    However, as a result of the police cover-up of the Francisco Poventud mis-identification, the BDAO did not know about, and did not disclose to the defense, Duopo's "statement" misidentifying Francisco Poventud.

60.    This was so even though the Individual Defendants knew the court was holding a pretrial hearing, at which several of them testified, concerning the lawfulness of the identification procedures used with Duopo and whether Duopo's in-court and out-of-court identifications of Plaintiff and Maldonado were sufficiently reliable to be permitted in evidence.

61.    The Individual Defendants knew that Duopo's misidentification of Francisco Poventud would be highly relevant to the court's determination of such hearing.

62.    Indeed, at the hearing, the court expressed concern that the repeated showing of Marcos Poventud's photograph to Duopo during the three photo identification procedures was unfairly suggestive and raised questions about Duopo's ability to make a reliable, in-court identification.

63.    Even though the court then required the prosecution to present Duopo as a witness to establish his independent ability to make a reliable, in-court identification, the police continued to suppress the Francisco Poventud identification evidence, causing the prosecution to fail to disclose it.

9

64.     As a result, the court ruled that Duopo would be allowed to make an in-court identification of Plaintiff.

65.     The prosecutor at the hearing and the trial was Assistant District Attorney ["ADA"] Gregg Turkin.

66.     Prior to and during trial, the Individual Defendants reviewed the evidence, including the police investigation, with ADA Turkin, but still did not reveal to him the Francisco Poventud photo identification procedure and misidentification.

67.     Indeed, they deliberately misled ADA Turkin into believing that, since Francisco Poventud was incarcerated when the crime was committed, they had no reason to, and in fact did not, conduct any identification procedure containing his photograph.

68.     During the trial, the prosecution did not disclose to Plaintiff or to any defense counsel the Francisco Poventud photo identification procedure, Duopo's identification of Francisco's photo, or the existence of anything written by Duopo concerning such an identification procedure.

69.     The evidence "against" Plaintiff at trial was extremely limited: it consisted solely of Duopo's testimony identifying him, as well as the alleged discovery of his brother's wallet and old identification cards in the front passenger area of the livery taxi.

70.     No physical evidence linked Plaintiff to the crime.

71.     There was substantial evidence undermining the reliability of Duopo's identification testimony.  First, the jury learned that Duopo had failed to identify Plaintiff during the first two photo arrays containing his likeness.

72.     Second, right in front of the jury, Duopo misidentified co-defendant Robert Maldonado's brother as one of his assailants.

10

73.     Meanwhile, Duopo's testimony identifying Plaintiff was contradicted by the defense case. Plaintiff testified in his own behalf that at the time of the crime he was at a neighbor's apartment playing video games and watching movies.

74.     Several defense witnesses also gave testimony supporting this alibi.

75.     In addition, the defense presented evidence that the weapon used to shoot Duopo had been recovered in the possession of three other men, during a similar robbery attempt, just 17 days after the Duopo robbery.

76.     The purported "reliability" of Duopo's identification of Plaintiff, as well as the professionalism of the police investigators who had obtained Duopo's identifications of the defendants, were the key issues addressed by both sides during their closing arguments to the jury.

77.     Even without knowledge of the Francisco Poventud misidentification evidence, or of the Individual Defendants' cover-up of it, the jury initially said it was deadlocked.

78.     On the morning of the third day of deliberations, the jury requested a "read back" of the detectives' and the complainant's testimony regarding the "negative results" from the March 13, 1997, photo array involving Plaintiff's photo.

79.     That evening, the jurors stated they were "hopelessly deadlocked" with regard to both defendants.

80.     Nevertheless, after the court required them to continue deliberating for two more days, the jury returned a verdict of guilty against both defendants.

81.     The prosecution's failure to disclose Duopo's misidentification of Francisco Poventud, as well as the police cover-up and lies concerning this evidence, was a substantial and proximate cause of Plaintiff's conviction.

82.     On June 30, 1998, the court sentenced Plaintiff to serve an indeterminate sentence of 10 to 20 years in prison.

83.     At the time of Plaintiff's conviction, he was 26 years old, had never been in prison before, and was of slight build.

84.     The Individual Defendants knew of these characteristics of Plaintiff.

85.     They also knew that individuals with Plaintiff's characteristics were likely to be physically and sexually assaulted in New York City jails and in New York State maximum security prisons.

86.     While Plaintiff appealed his conviction, the Individual Defendants continued to withhold knowledge from the BDAO, and therefore from the defense, of Duopo's mis-identification of Francisco Poventud.

87.     Plaintiff's appeal was denied.  *See People v. Poventud*, 300 A.D.2d 223, 752 N.Y.S.2d 654 (1st Dep't 2002), *leave to appeal denied*, 1 N.Y.3d 578, 775 N.Y.S.2d 794 (2003).

### The Discovery of the *Brady* Violation and Vacatur of Plaintiff's Conviction

88.     On April 25, 2002, the New York Court of Appeals reversed co-defendant Robert Maldonado's conviction, and directed that Maldonado be retried.  *See People v. Maldonado*, 97 N.Y.2d 522, 743 N.Y.S.2d 389 (2002).

89.     At the retrial held in late 2003, Duopo's ability to make a reliable identification was again the principal issue.

90.     By the time of this retrial, either the NYPD or the BDAO had somehow lost or destroyed the original Francisco Poventud identification cards.

91.     A new prosecutor was assigned to the case, Assistant D.A. Jeremy Shockett.

92.     He offered as a substitute for the original cards a photocopy of one of them.

12

93.     The photocopy contained illegible handwriting, and a date and time – "3/10/97 at 1943 hrs."

94.     Contending that the handwriting was irrelevant to the case, Shockett made an application to the court for permission to redact the writing from the photocopy.

95.     The defense objected, and the court denied the request.

96.     Maldonado's attorney demanded to know the significance of the handwriting.

97.     After speaking with UMLAUFT and learning for the first time what the handwriting meant, Shockett then revealed to the defense that the handwriting was Duopo's and concerned a mistaken identification of Francisco Poventud .

98.     UMLAUFT, during his testimony, tried to minimize the impact of this evidence by falsely claiming that Duopo, from his hospital bed, had simultaneously written a note stating that the photograph merely "looked like the guy."

99.     However, even though UMLAUFT knew that any such note, as a recorded statement by Duopo, absolutely was required to be preserved and to be disclosed to the defense as *Rosario* material, he could not produce it.

100.    No one, aside from UMLAUFT, has ever claimed to have seen such a note.

101.    This time, the jury acquitted Maldonado.

102.    On March 25, 2004, Plaintiff, who was indigent, requested, and the court thereafter agreed, to assign counsel for him to prepare and file a motion, pursuant to N.Y. Criminal Procedure Law § 440.10, to vacate his conviction on the ground that the prosecution had impermissibly failed to disclose to him the Francisco Poventud identification and any writings regarding it (hereinafter referred to as the "*Brady* material") at his trial six years before.

103.    On December 6, 2004, Plaintiff's assigned counsel filed a CPL § 440.10 motion to vacate his conviction.  The motion asserted that, at the time of Plaintiff's trial in 1998, Plaintiff and his attorney were not told, and did not know, about the *Brady* material, even though the defense had specifically requested disclosure of just this type of evidence.

104.    Before responding to this motion, ADA Shockett interviewed UMLAUFT.

105.    UMLAUFT lied to Shockett.  UMLAUFT claimed that he had told then ADA Turkin, during Plaintiff's trial in 1998, about the *Brady* material.

106.    UMLAUFT further lied by stating that, at Turkin's direction, he had disclosed the Francisco Poventud identification procedure to defense lawyers during an informal hallway conversation.

107.    As a result of UMLAUFT's lies, Shockett and the BDAO decided to oppose Plaintiff's motion.  They submitted court papers, including UMLAUFT's false affidavit, denying any withholding of evidence under *Brady* and delaying any court decision until after a hearing.

108.    At an evidentiary hearing held on June 15, 2005, UMLAUFT gave false testimony repeating what he had told ADA Shockett.  *See* ¶¶ 105-106, *supra*.

109.    The defense lawyers for Plaintiff and co-defendant Robert Maldonado denied under oath that UMLAUFT had made any disclosure to them of the *Brady* material.

110.    The BDAO did not call Turkin to testify at all.

111.    In a decision dated October 6, 2005, the court (Hunter, J.S.C.) credited the defense attorneys over UMLAUFT and held that the prosecutor's failure to turn over information and written documents regarding Duopo's misidentification of Francisco Poventud had violated Plaintiff's constitutional rights under *Brady*.

14

112.    The court vacated Plaintiff's conviction.  *See People v. Poventud*, 10 Misc.3d 337, 802 N.Y.S.2d 605 (Sup. Ct. Bronx Co. 2005), annexed hereto as Exhibit A.

113.    At the time of its ruling, Plaintiff had been incarcerated more than seven years following, and as a direct result of, his unconstitutionally-obtained conviction.

### Plaintiff's Injuries and Damages

114.    As a direct, proximate, and reasonably foreseeable consequence of the aforementioned actions by the defendants, plaintiff:

(1)    Was denied his state and federal constitutional rights and liberties;

(2)    Was repeatedly subjected to forcible sexual assaults at knife-point and otherwise, including anal and oral sodomy, and physical beatings;

(3)    Was further traumatized by witnessing sexual and physical assaults on other inmates;

(4)    Was so distraught that he tried to kill himself;

(5)    Suffered severe mental, emotional, and physical distress, including suicidal feelings;

(6)    Suffered permanent mental and emotional harm;

(7)    Was denied the opportunity to pursue normal relationships with and to enjoy the companionship of family members and friends;

(8)    Was publicly shamed, disgraced, ridiculed and humiliated and suffered damage to reputation;

(9)    Suffered lost wages and permanent impairment of earning capacity; and

(10)    Incurred other items of attendant damages.

## FIRST CAUSE OF ACTION

### (42 U.S.C. §1983; Denial Of Due Process And A Fair Trial; All Individual Police Defendants)

115.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 as if fully set forth herein.

116.    Prior to Plaintiff's conviction in 1998, and continuing thereafter, the Individual Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from the BDAO and Plaintiff of, the "*Brady* material."

117.    The Individual Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to disclose the *Brady* material to the BDAO so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, (b) under the unique circumstances of this case, to disclose the *Brady* material directly to the defense, and/or (c) to make truthful statements to the prosecution concerning the existence of the *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

118.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed the *Brady* material from, lied about, and otherwise failed to disclose the *Brady* material to, the BDAO and Plaintiff.

119.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of Duopo's reliability as an identification witness and of

the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

120.    After the Francisco Poventud misidentification evidence was revealed at the Maldonado retrial in 2003, Defendant UMLAUFT sought to cover up and perpetuate the defendants' individual and collective wrongdoing, and caused the continuation of Plaintiff's illegal imprisonment and resultant damages, by falsely telling the BDAO, and submitting a false affidavit and giving false testimony, that he had disclosed such *Brady* material to defense counsel at Plaintiff's trial.

121.    The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and to not be convicted or punished based upon the government's knowing use of false or misleading testimony or argument, all in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

122.    The foregoing violations of Plaintiff's federal constitutional rights by the Individual Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably brought about Plaintiff's conviction, his imprisonment until such time as his conviction was vacated, and his other injuries and damages.

123.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law.

17

124.    Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

125.    By reason of the foregoing, all the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## SECOND CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD)

126.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 125 as if fully set forth herein.

127.    Prior to Plaintiff's arrest, policymaking officials at the NYPD, including but not limited to the New York City Police Commissioner, with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of police investigators to make timely disclosure to the District Attorney and/or the defense of *Brady* material, to provide truthful information to prosecutors about their knowledge of criminal investigations they have conducted, and to testify truthfully, accurately, and completely during criminal proceedings concerning such investigations.

128.    The above-mentioned *Brady* material included, but was not limited to, evidence of innocence, evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses.

129.    The aforesaid policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew:

a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)    either that such issues present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations and by the incentives that police employees have to make the wrong choice in such situations; and

c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

130.    The aforementioned policymaking officials had notice of the need to properly instruct, train, supervise and/or discipline employees with regard to their aforementioned constitutional obligations based upon, among other circumstances:

a)    numerous credible allegations, many substantiated by judicial decisions, that police officers had wrongfully withheld, lost, or destroyed evidence favorable to the defense that they had been required to timely disclose to the prosecution or the defense under *Brady* and *Rosario* (*see* Ex. B, appended hereto and incorporated herein by reference, listing some of those judicial decisions);

b)    numerous civil lawsuits, some of which resulted in substantial civil settlements, alleging that police had falsified, exaggerated, or withheld evidence, thereby improperly causing unlawful injuries to individuals suspected of crimes (*see* Ex. C, appended hereto and incorporated herein by reference, listing some of those lawsuits);

c)    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule;

19

d)      judicial decisions directly criticizing the NYPD for failing to train and supervise
officers in their *Brady* obligations and for failing to adopt adequate *Brady*
disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985)
(McLaughlin, D.J., adopting the Report and Recommendation of then-Magistrate
Shira A. Scheindlin), and putting the NYPD on notice that the City could be held
liable for its failure to adequately train police officers and investigators regarding
their *Brady* and truth-telling obligations, *see Walker v. City of New York*, 974 F.2d
293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e)      the report dated July 7, 1994, following highly-publicized hearings, of a blue-
ribbon New York City investigation into police misconduct known as the "Mollen
Commission," and

f)      the inherent obviousness of the need to train, supervise and discipline police
officers in such obligations to counteract the pressure on officers to close cases and
to obtain convictions and the powerful incentives they have to ignore, discard, fail
to record, and fail to disclose evidence favoring a criminal suspect or defendant.

131.    Under the principles of municipal liability for federal civil rights violations, the

City's Police Commissioner (or his authorized delegates), had (and has) final responsibility for

training, instructing, supervising, and disciplining police personnel with respect to the

investigation and prosecution of criminal matters, including constitutional requirements with

respect to the disclosure of *Brady* material and the giving of truthful statements and testimony

during criminal proceedings.

132.    The Police Commissioner, personally and/or through his authorized delegates, at

all relevant times had final authority, and constitutes a City policymaker for whom the City is

liable, with respect to compliance by employees of the NYPD with the above-mentioned

constitutional requirements.

133.    During all times material to this Complaint, policymaking officials for the NYPD,

including, the Police Commissioner, owed a duty to the public at large and to Plaintiff, which

they knowingly and intentionally breached, or to which they were deliberately indifferent, to

implement policies, procedures, customs, practices, training, and/or discipline sufficient to deter

and to prevent conduct by his subordinates which violates the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

134.    The aforesaid constitutionally inadequate policies, procedures, regulations, practices, customs, training, and/or discipline of or by Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and Laws of the United States.

135.    By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## THIRD CAUSE OF ACTION

### (Defendant City of New York for Negligent Hiring, Training, Supervision, And Discipline; Pendent Claim)

136.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 135, and hereby incorporates them as though fully set forth herein.

137.    Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York on March 27, 2006.

138.    Hearings pursuant to New York General Municipal Law § 50-h were waived by Defendant City of New York.

139.    By virtue of the foregoing, Defendant City of New York is liable to Plaintiff for his injuries because its grossly negligent, careless, negligent, reckless and/or deliberate failure to properly hire, train, discipline, and/or supervise its agents, servants and/or employees employed

by the NYPD, including the Individual Defendants, with regard to their aforementioned duties, was a reasonably foreseeable and proximate cause of the injuries suffered by Plaintiff.

## **JURY TRIAL DEMAND**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.    For compensatory damages in an amount to be determined;

b.    For punitive damages against the Individual Defendants in an amount to be determined;

c.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d.    For pre-judgment interest as allowed by law; and

e.    For such other and further relief as this Court may deem just and proper.

ROMANO & KUAN, PLLC

BY: Julia P. Kuan, Esq (JK 3822)
100 Lafayette Street, Suite 401
New York, New York, 10013
(212) 274-0777


LAW OFFICES OF JOEL B. RUDIN

BY: Joel B. Rudin, Esq. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600

*ATTORNEYS FOR THE PLAINTIFF*

Dated:   New York, New York
           May 6, 2011

To:      Corporation Counsel of the
          City of New York

22

# EXHIBIT A

# EXHIBIT A

802 N.Y.S.2d 605
Supreme Court, Bronx County, New York.

The PEOPLE of the State of New York
v.

Marcos POVENTUD, Defendant.

Oct. 6, 2005.

**Synopsis**

**Background:** Defendant moved to vacate his judgment of conviction for attempted murder in the second degree and other related crimes.

**Holdings:** The Supreme Court, Bronx County, Alexander W. Hunter, J., held that:

1 *Brady/Rosario* violation occurred when prosecutor failed to turn over written statement by complainant wherein he identified defendant's brother in photo array, and

2 *Brady/Rosario* violation warranted new trial.

Motion granted.

**Attorneys and Law Firms**

**\*\*605** Jeremy Shockett, Assistant District Attorney, Attorney for Plaintiff.
**\*\*606** Julia Kuan, Esq., Attorney for Defendant.

**Opinion**

ALEXANDER W. HUNTER, J.

**\*338** Defendant moved to vacate his judgment of conviction for attempted murder in the second degree and other related crimes on the ground that his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961) were violated and on the ground that there is newly discovered evidence.

This court decided the motion with respect to newly discovered evidence in a decision dated March 28, 2005. With respect to that branch of the motion that involved a *Brady/Rosario* violation, this court held a hearing that was conducted over several days beginning on May 12, 2005 and concluding on June 15, 2005. The parties were permitted to submit post-hearing briefs and the defendant's reply brief was received by this court on September 16, 2005. In determining that branch of the motion which involved the *Brady/Rosario* violation, this court hereby incorporates all of the documents submitted by the defendant and the People prior to the hearing of this matter in addition to the evidence introduced at the hearing. At the hearing, the defendant called two witnesses: Edmund Byrnes, Esq., trial counsel for defendant Poventud and Douglas Lyons, Esq., trial counsel for co-defendant Robert Maldonado. The People called one witness, Sergeant Kenneth Umlauft.

The defendant and a co-defendant, Robert Maldonado, were convicted on April 29, 1998 of shooting Younis Duopo during a robbery of his livery cab. In May 2002, the Court of Appeals reversed the conviction of Robert Maldonado and remanded the case for a new trial. During the course of Maldonado's second trial, defendant Poventud claims that new evidence was introduced which demonstrated that the prosecution did not turn over evidence that was favorable to the defendant, thus resulting in a *Brady* violation. Specifically, on March 10, 1997, the complainant viewed a photo array presented by Sergeant Kenneth

Umlauft, selected an identification card bearing the photograph of Francisco Poventud, the defendant's brother, initialed and dated it and wrote on a separate piece of paper "looks a lot like him."[1]

[1]    There are several variations of the exact statement made by the complainant.

At the heart of defendant's motion is his assertion that he was not informed by the prosecution that the complainant had selected Francisco Poventud, the defendant's brother, as a person resembling one of his assailants, nor did the prosecution provide the defense with any documentation written by the  **\*339**  complainant regarding said identification procedure, thus resulting in a *Rosario* violation. The piece of paper where the complainant wrote " looks a lot like him," was never turned over and has never been located though Sgt. Umlauft testified that it was placed in the case folder.

This court credits the testimony of defense counsel Edmund Byrnes and defense counsel Douglas Lyons. Defendant's trial counsel, Edmund Byrnes, testified at the hearing that he was never informed by the District Attorney's office of the identification proceeding involving defendant Poventud's brother Francisco nor was the paper where he wrote "looks a lot like him" ever turned over to him. He testified at length as to how he would have used that identification procedure at the trial if he had been informed of it. The People allege that during the trial, Sgt. Umlauft had an off-  **\*\*607**  the-record conversation with both Mr. Byrnes and co-counsel Douglas Lyons, wherein Sgt. Umlauft informed both attorneys as to this identification procedure involving defendant Poventud's brother. Douglas Lyons, Esq., testified that he did not recall having an off-the-record conversation with Sgt. Umlauft which involved the identification procedure at issue. Both attorneys testified that there would be no strategic or tactical reason not to use that misidentification procedure at the trial when identification of the defendants played such a major role.

Sgt. Umlauft's testimony was that he conducted the identification procedure at the hospital while the complainant was "awake" and "alert" but not able to speak. In addition, Sgt. Umlauft testified that the complainant did not have his glasses on but he looked at the photo array and wrote on a pad, "looks like him." Sgt. Umlauft had the complainant sign by the photo where he wrote that statement and testified that he had a conversation with the assigned Assistant District Attorney, Greg Turkin, about the identification proceeding. He further testified that A.D.A. Turkin told him to speak to the two defense attorneys at a recess during the trial about the identification proceeding and he did so in the rear of the courtroom.

1    Under *People v. Vilardi*, 76 N.Y.2d 67, 556 N.Y.S.2d 518, 555 N.E.2d 915 (1990), the standard to be used to determine whether or not a defendant is entitled to a new trial based upon the prosecution's failure to disclose exculpatory material, which has been requested, is a "reasonable possibility" that the failure to disclose the exculpatory evidence contributed to the verdict. Moreover, C.P.L. § 240.45(1)(a), states that,  **\*340**  "After the jury has been sworn and before the prosecutor's opening address ... the prosecutor shall, subject to a protective order, make available to the defendant: (a) Any written or recorded statement ... made by a person whom the prosecutor intended to call as a witness at trial, and which relates to the subject matter of the witness's testimony." The prosecutor failed to turn over the written statement by the complainant wherein he identified defendant Poventud's brother, therefore, there was a violation under *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).

The numerous documents and transcripts submitted by the defendant in his motion demonstrate that the jury struggled with the issue of identification. In one of the jury's notes, a copy of which was attached to defendant's motion as Exhibit C, the jury requested to hear the testimony of the complainant regarding one of the photo arrays, they wanted to view the two photo arrays entered into evidence, they wanted to see defendant Poventud's identification cards from his wallet, and, more importantly, they wanted to hear testimony regarding "negative results." (See, Juror Note No. 3, Defendant's Exhibit C). Moreover, the jury sent a note to the court during deliberations, indicating that they were "hopelessly deadlocked." (See Juror Note # 6, Defendant's Exhibit 6).

In a case such as this one where the conviction depended on the identification by the complainant of the defendants, an identification of an individual other than the defendants on trial for the robbery is of great magnitude. The People, in their brief submitted August 26, 2005, assert that the misidentification and written statement made by the complainant is not *Brady* material and that there is no reasonable possibility that the material would have contributed to the verdict because the complainant was not

People v. Poventud, 10 Misc.3d 337 (2005)

802 N.Y.S.2d 605, 2005 N.Y. Slip Op. 25420

wearing his glasses at the time of the misidentification, was medicated,  **608  and he was "not completely coherent." (People's Brief, p. 1-2).

2  Those factors listed by the People are for the jury to weigh and determine what significance, if any, to place upon them. The fact is that there was an identification procedure performed whereby the complainant identified an individual other than the defendants on trial as committing the robbery. The question of whether defendant Poventud and his brother facially look similar or not in appearance especially in light of the fact that *341 defendant's brother was incarcerated at the time of the robbery of Mr. Duopo is a crucial issue for the jury to consider. Whether or not material should be considered exculpatory and turned over to the defendant is not subject to question. This material was required by law to be turned over to the defense. What the defense and jury does with it is totally within their respective province of advancing a criminal defense and as fact finders.

Furthermore, whether or not the identification made by the complainant of the defendant's brother was a "tentative identification" as the People allege is not a factor in determining whether material is *Brady* material or not. Any identification procedure or misidentification procedure made by a complainant should be turned over to a defendant who stands accused of the crime regardless of the importance that the District Attorney's office may or may not place on it. The obligation to turn over such *Brady* material rests squarely on the shoulders of the prosecutor and in this instance, the prosecutor failed in his obligation.

Moreover, glaringly absent from the hearing was testimony from the assigned Assistant District Attorney, Greg Turkin, though he was available to testify as to his version of the events. The People assert that Assistant District Attorney Greg Turkin directed the defense attorneys to speak with Sgt. Umlauft regarding the photo array in question. However, as the defendant correctly asserts, the prosecutor had an affirmative duty to inform defense counsel about the identification procedure and defense counsel should not have to go on a "fishing expedition" to obtain said material.

This court finds that the defendant met his burden by a preponderance of the evidence that *Brady/Rosario* material was not disclosed and that there is a reasonable possibility that the material in question could have affected the outcome of the trial.

Accordingly, the defendant's conviction is hereby vacated and a new trial is hereby ordered which shall be preceded by a *Wade* hearing.

This shall constitute the decision and order of this Court.

**Parallel Citations**

10 Misc.3d 337, 2005 N.Y. Slip Op. 25420

**End of Document**                                    © 2010 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

*Poventud v. City of New York*, 07 Civ. 3998 (DAB)(THK)

Exhibit C

1.  *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve. The court found that the D.A.'s office shared responsibility and the indictment was dismissed.

2.  *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

3.  *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.  *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

5.  *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6.  *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

7.  *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

8.  *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care."

9.  *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

10. *People v. Joseph*, 86 N.Y.2d 565 (1995): Adverse inference instruction appropriate where police deliberately destroyed interview notes.

11. *People v. White*, 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine

officer using missing memo book.

12.    *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997):  Conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained "variations".

13.    *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997): Conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that significantly were at variance with prosecution's evidence at trial and were favorable to defendant.

14.    *People v. Branch*, 175 Misc.2d 933 (Sup. Ct. Kings County 1998): People successfully fought motion to vacate judgment based upon confession of real killer; conviction overturned in 2002 after key prosecution witness recanted and said police paid him for his cooperation.

15.    *People v. Cannon*, 191 Misc.2d 136 (Sup. Ct. Kings Co. 2002): Motion to vacate conviction denied, but Brooklyn D.A.'s office and NYPD warned of future sanctions if the police continue policy of destroying or failing to preserve evidence.

# EXHIBIT C

*Poventud v. City of New York*, 07 Civ. 3998 (DAB)(THK)

<u>Exhibit D</u>

1.  *Hart v. City of New York*, 186 A.D.2d 398 (1st Dept. 1992): Damage award upheld against police officers who gave false grand jury and trial testimony.

2.  *Tong v. City of New York, et al.*, 95-cv-7965 [S.D.N.Y., settled 10/4/95, $35,000]: Plaintiff arrested for traffic violation, which was later dismissed. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

3.  *Dabbah v. City of New York, et al.*, 95-cv-2952 [S.D.N.Y., settled 3/12/96, $35,000]: Plaintiff arrested without probable cause on disorderly conduct charges; charges dismissed on People's motion 8 months after arrest.

4.  *Boland v. City of New York, et al.*, 93-cv-5058 [E.D.N.Y., settled 8/6/96, $30,000]: Plaintiff arrested without probable cause; held in custody for two nights.

5.  *Kadlub v. City of New York, et al.*, 95-cv-1080 [E.D.N.Y., settled 12/11/96, $34,000]: Plaintiff arrested without probable cause on drug possession and sale charges. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

6.  *Castro v. City of New York, et al.*, 94-cv-5114 [S.D.N.Y., settled 3/18/97, $72,500]: Plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

7.  *McCaskill v. City of New York, et al.*, 96-cv-3687 [E.D.N.Y., settled 7/10/97, $100,000]: Plaintiff arrested for disorderly conduct without probable cause; charges pending for approximately 6 months before dismissal by the court.

8.  *Gurley v. City of New York, et al.*, 95-cv-2422 [E.D.N.Y., settled 8/21/97, $1,7500,000]: Conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint alleged that NYPD had longstanding policy of deliberate indifference to the constitutional requirement that exculpatory evidence be preserved and disclosed to defendants.

9.  *Gaylock v. City of New York, et al.*, 96-cv-6183 [E.D.N.Y., settled 3/6/98, $90,000]: Plaintiffs arrested without probable cause on weapons charges, which were pending for

10 months before dismissal by court. Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

10. *Gordon v. City of New York, et al.*, 97-cv-8035 [S.D.N.Y., settled 11/12/98, $40,000]: Plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor 3 months after arrest.

11. *Perez v. City of New York, et al.*, 98-cv-2331 [S.D.NY., settled 1/16/99, $15,000]: Plaintiff arrested without probable cause; charges dismissed by court approximately 6 months after arrest.

12. *Ziehenni v. City of New York, et al.*, 98-cv-3763 [S.D.N.Y., settled 3/5/99, $55,000]: Plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

13. *Deluise v. City of New York, et al.*, 98-cv-2551 [S.D.N.Y., settled 3/18/99, $28,500]: Plaintiff arrested without probable cause.

14. *Napoli v. City of New York, et al.*, 97-cv-1255 [E.D.N.Y., settled 4/9/99, $60,000]: Plaintiff arrested on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

15. *Jefferson v. City of New York, et al.*, 98-cv-1097 [E.D.N.Y., settled 4/14/99, $175,000]: Plaintiff corrections officer arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

16. *Denizard v. City of New York, et al.*, 98-cv-423 [E.D.N.Y., settled 6/4/99, $64,000]: Plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

17. *Sweazie v. City of New York, et al.,* 99-cv-419 [E.D.N.Y., settled 10/20/99, $20,000]: Plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB.

18.  *Daniels v. City of New York, et al.*, 00-cv-1981 [S.D.N.Y., settled 3/15/00, $28,500]: Plaintiff arrested without probable cause on weapons charges; charges dismissed by the court 8 months after arrest.

19.  *Almonte v. City of New York, et al.*, 99-cv-519 [E.D.N.Y., settled 7/12/00, $30,000]: Plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court 1 year, 9 months after arrest. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional rights, failure to train police officers, and negligent hiring of officers, which caused plaintiff's malicious prosecution and unlawful arrest.

20.  *Fields v. City of New York, et al.*, 99-cv-8130 [E.D.N.Y., settled 7/28/00, $15,000]: Plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court. Complaint alleged *Monell* theory of liability based on the City's failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights.

21.  *Younger v. City of New York, et al.*, 00-cv-836 [S.D.N.Y., settled 9/1/00, $25,000]: Plaintiff arrested without probable cause; complaint alleged that arrest was made in retaliation for plaintiff's complaint to IAB.

22.  *Lovell v. City of New York, et al.*, 00-cv-0002 [S.D.N.Y., settled 10/20/00, $40,000]: Plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint. Complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB.

23.  *Cotto v. City of New York, et al.*, 00-cv-1341 [E.D.N.Y., settled 12/01/00, $30,000]: Plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

24.  *Coleman v. City of New York, et al.*, 00-cv-2019 [E.D.N.Y., settled 1/2/01, $60,000]: Two plaintiffs arrested without probable cause.

25.  *Crespo v. City of New York, et al.*, 93-cv-8847 [S.D.N.Y., settled 8/29/06, $25,000]: Plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2011, I served by E-mail upon the following attorneys representing the Defendants, true and correct copies of **Plaintiff's Second Amended Complaint**:

Rachel Seligman Weiss, Esq.
Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007
rseligma@law.nyc.gov

Linda Donahue, Esq.
Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007
ldonahue@law.nyc.gov

Peggy Migdalis, Esq.
Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007
pmigdali@law.nyc.gov

Ellen Buckwalter, Esq.
Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007
ebuckwal@law.nyc.gov

A hard copy also is being sent to Ms. Seligman Weiss.

JOEL B. RUDIN

Dated:  New York, New York
        May 6, 2011